# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ERNIE PINKSTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 13 C 7399 |
| | ) | |
| CITY OF CHICAGO, | ) | Judge John Z. Lee |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ernie Pinkston, proceeding pro se, has filed suit under 42 U.S.C. § 1983 against his former employer, the City of Chicago, for depriving him of his right to equal protection under the Fourteenth Amendment of the United States Constitution based on race and perceived disability. Pinkston has also sued the City for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.*, and disability discrimination and retaliation under the Americans with Disabilities Act (ADA), as amended by the Amendments Act of 2008 (ADAAA), 42 U.S.C. § 12102(3).[1] The City has filed a motion for summary judgment as to all claims. For the reasons explained below, the City's motion is granted in part and denied in part.

## Facts

Unless otherwise indicated, the following facts are undisputed. The City hired Pinkston, who is African-American, as a firefighter for the Chicago Fire Department (CFD) in 1983. Def.'s LR 56.1(a)(3) Stmt. ¶ 1; Def.'s Ex. C, Pl.'s Dep. Ex. Pinkston Work History, at

---

[1] In his response brief, Pinkston lists his causes of action, but then states that he intends to amend his complaint to also state a due process violation under § 1983. Pl.'s Resp. Br. at 1. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th Cir. 1996). In ruling on the City's summary judgment motion, the Court declines to address the proposed due process claim.

PIN000002, ECF No. 86-4 at 32–33 (Work History).  Pinkston was promoted to Fire Engineer in

1987, to Lieutenant in 1989, to Captain in 1993, and to Battalion Chief in 2000.  Work History,

at PIN000002.    He  eventually  was  appointed  Deputy  District  Chief  (DDC)  by  CFD

Commissioner Glenn E. Carr in 2004.  *Id.*; *see* Pl.'s Ex. 2, Pinkston Dep. Exs., 9/2/04 Mem.

from G. Carr, at 1.

Pinkston's DDC position is an exempt-rank position.  Def.'s LR 56.1(a)(3) Stmt. ¶ 12.[2]

Although exempt-rank employees are not represented by the Chicago Fire Fighters Union, Local

2, see *id.* ¶ 7, the record is unclear whether, or to what extent, exempt-rank employees are subject

to  the  provisions  of  the  Collective  Bargaining  Agreement  (CBA)  between  the  City  and  the

Chicago Fire Fighters Union, Local No. 2.  *Compare id.* ¶ 9 (stating that Deputy District Chiefs

like  Pinkston  are  not  subject  to  the  CBA),  *with id.*  ¶ 1  (citing  Pl.'s  Dep.  Ex. 9,  4/12/12

Termination Letter at PIN000024 (stating that Pinkston was terminated pursuant to a provision

of the CBA)), *and* Def.'s Ex. E, Bryant Aff. ¶ 3 (same), *and* Def.'s Ex. F, Ignacio Aff. ¶ 21

(stating that the CBA's Sick and Injury Leave Provision applies to Pinkston).

During Pinkston's tenure as a DDC, he went on medical status, which is also referred to

as a "lay-up," due to back pain on July 19, 2011.  Def.'s LR 56.1(a)(3) Stmt. ¶ 26; *see* Def.'s Ex.

M, CFD General Order, Department Medical Procedure, at PIN000220.  This lawsuit is based on

what occurred during and after his lay-up.

### A.  Pinkston Is Denied "the Age 55 Option"

During Pinkston's lay-up, he was unable to obtain what is called the "Age 55 Option."

The Age 55 Option enabled Union-represented employees to retire at the age of 55, rather than

60, and obtain fully funded health care coverage.  Def.'s LR 56.1(a)(3) ¶ 13; Pl.'s Ex. 2, Pl.'s

---

[2]        An exempt-rank employee is an employee who is not represented by the Chicago Fire Fighters
Union.  Def.'s LR 56.1(a)(3) Stmt. ¶ 7.

Dep. Exs., Mem. of Understanding, at PIN000346. The City issued a Department Memo on September 2, 2011, stating that the Age 55 Option was available to Union-represented employees and that the deadline for notifying acceptance of the offer to CFD was November 1, 2011. *See* Def.'s Ex. D, Vazquez Aff. Ex. 4, 9/2/11 Memo re: Age 55 Option, PIN001404 (Memo). Although Anthony Vasquez, Deputy Fire Commissioner of the Bureau of Administrative Services for the CFD, asserts that the Memo also served to notify exempt-rank employees that they were eligible for the Age 55 Option, the Memo does not mention exempt-rank employees. *Compare* Def.'s Ex. D, Vazquez Aff. ¶ 14, *with id.*, Ex. 4, *and* Def.'s Ex. B, Pl.'s Dep. Vol. II, at 35:3–7, Dec. 14, 2015 at 3:23 p.m. (Pl.'s Dep. II) (admitting to having seen the Memo but denying that it applied to him as an exempt-rank member).

One day before the expiration of the Age 55 Option, at 2:26 p.m., then-Acting Chief Jose Santiago sent an email to all exempt-rank CFD employees, including Pinkston, stating that there would be a telephone conference regarding the Age 55 Option nineteen minutes later at 2:45 p.m. Def.'s LR 56.1(a)(3) Stmt. ¶ 20; *see* Pl.'s Dep. II Ex., 10/31/11 Email from J. Santiago, at PIN000983. Pinkston states that he never received this email, and the parties dispute whether off-duty employees, like Pinkston, had remote access to their CFD emails. *Compare* Def.'s LR 56.1(a)(3) Stmt. ¶ 21, *with* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 21.

Although it is unclear which exempt-rank employees participated in the telephone conference, it is undisputed that Pinkston did not. Def.'s LR 56.1(a)(3) Stmt. ¶ 22. During the conference, Santiago stated that exempt-rank employees, who self-demote to their bargaining unit Fire Suppression and Rescue (FS&R) career service position, would be eligible for the Age 55 Option if they provided a notarized notice of intent to retire by the next day. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 21. This was the first time in CFD history that exempt-rank employees

were permitted to self-demote to be eligible for the Age 55 Option. Def.'s LR 56.1(a)(3) Stmt. ¶ 19; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 21.

The next day, Pinkston called one of his supervisors, District Chief Anthony King, at 11:45 a.m., but because King was busy at the time, Pinkston was asked to call back. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22. Pinkston complied and eventually spoke to King at 12:47 p.m. *Id.* King informed Pinkston of his eligibility for the Age 55 Option, and Pinkston told King he intended to participate. Def.'s LR 56.1(a)(3) Stmt. ¶ 22; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22; Def.'s Ex. D, Vasquez Dep. Ex. 4, Notice of Benefits, PIN001405.[3] To participate in the Age 55 Option, however, Pinkston was required to turn in the paperwork by 3:00 p.m. that same day, and given the time constraints, he was unable to do so. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 24; *see* Def.'s LR 56.1(a)(3) Stmt. ¶ 24.

Pinkston was denied the opportunity to participate in the Age 55 Option. Def.'s LR 56.1(a)(3) Stmt. ¶ 76. In early November 2011, Pinkston complained to his boss, Jose Santiago, and to Fire Commissioner Hoff, that the CFD had denied him the Age 55 Option due to his race. Pl.'s Dep. II, at 63:8–14; 80:8–13.

Along those lines, only two white DDCs, Thomas Lynch and Paul Martin, were able to participate in the Age 55 Option; no black DDSs participated. *See* Def.'s Ex. D, Vasquez Aff. Ex 6, at PIN001593; *id.* Ex. 7, 11/1/11 Reassignments, at PIN001678; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 18. Two black District Chiefs, Anthony King and Jerome Shelton, were able to participate in the Age 55 Option, Def.'s LR 56.1(a)(3) Stmt. ¶ 1, but Pinkston asserts that District Chiefs are not similarly situated to DDCs because District Chiefs receive notice of the

---

[3] It is undisputed that Pinkston also spoke with CFD Deputy District Chief William Monroe that day at 3:37 p.m. for five minutes, but neither party has established the substance of this conversation. Def.'s LR 56.1(a)(3) Stmt. ¶ 23; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 23.

CFD announcements, such as the availability of the Age 55 Option for exempt-rank employees, firsthand from the Fire Commissioner. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22; Pl.'s Dep. II, at 62:13–17.

**B. Pinkston Attempts to Return to Work After Lay-up**

As noted, Pinkston went on lay-up due to back pain on July 19, 2011. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 26, 29; Def.'s Ex. K, Initial Lay-up Interview, at PIN000415; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 29. During his lay-up, Pinkston's primary care physician, Dr. Thomas Pitts, an internist and endocrinologist affiliated with Northwestern, treated his back pain as well as other health issues. Def.'s Ex. K, Medical Records, at PIN001367–68 (9/28/11), PIN001369 (8/3/11), PIN001371 (7/11/11). Throughout his lay-up, Pinkston reported to Dr. Isaac Morcos in the CFD's Medical Division to describe the care he had been receiving from Dr. Pitts. *Id.* at PIN000417–PIN000420; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 28.

Pinkston provided the CFD with a note dated November 30, 2011, from Dr. Pitts releasing him to return to work. Def.'s Ex. K, Medical Records, at PIN000428. Although Dr. Pitts had been treating Pinkston's back pain throughout the lay-up, Dr. Morcos told Pinkston that he could not return to work unless he was also evaluated and approved by an orthopedic surgeon. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 65; Pl.'s Dep. II, at 26:11–13. Pinkston then provided the CFD with two notes releasing him to full duty from Dr. Michael Haak, an orthopedic surgeon affiliated with Northwestern, on December 8, 2011. Def.'s Ex. K, Medical Records, at PIN001373–PIN001375; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54 (stating that he saw Dr. Haak twice because the City would not accept his first note releasing Pinkston to return to work). According to Pinkston, Dr. Morcos then instructed Pinkston that he could not return unless he obtained a release to return to work from an orthopedist that specifically addressed his right

knee, even though the reason for Pinkston's lay-up was his back and whatever issues he had had with his knee had long since subsided. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 40; Def.'s LR 56.1(a)(3) Stmt. ¶ 46; Def.'s Ex. K, Medical Records, at PIN000415. Pinkston complied nonetheless and provided a release to full duty from Dr. Arif Ali, an orthopedic surgeon affiliated with Advocate Health Care, on December 13, 2011. Def.'s LR 56.1(a)(3) Stmt. ¶ 40. CFD then asked Pinkston to submit a note releasing him to work from a cardiologist, and Pinkston provided two notes from Dr. Jeannine Turner, a cardiologist affiliated with Northwestern. *See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54; Def.'s LR 56.1(a)(3) Stmt. ¶ 50.

Although Pinkston had provided notes from four separate doctors stating that he could work without restrictions, the CFD then told him that he needed to undergo a Functional Capacity Examination (FCE) in order to return. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 56. As a result, Pinkston asked Medical Division Commander Sylvia Tienda to schedule an appointment through the CFD's Medical Division for an FCE. Tienda refused his request in December 2011 and told him not to return to the Medical Division. Def.'s Ex. B, Pl.'s Dep. II, at 13:15–16 (cited in Def.'s LR 56.1(a)(3) Stmt. ¶ 56).

The City intimates that anyone who has been on lay-up for an orthopedic issue is required to undergo an FCE. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 56. Pinkston lists a number of white CFD employees, who he believes were not required to undergo FCEs before returning from lay-ups for orthopedic issues. Pl.'s LR 56.1(b)(3)(C) Stmt. at 11–12; Pl.'s Ex. 21, Members with Orthopedic Issues Who Didn't Have to Take the FCE. For example, Pinkston states that John McCann, a white battalion chief, did not have to submit to an FCE before returning from a lay-up for a broken hand. *See* Pl.'s Dep. II, at 57:3–5, 107; Pl.'s Ex. 21, at 1.

### C. Pinkston Is Taken Off of the Payroll

During the period of time that Pinkston was not permitted to return to work due to the lack of an FCE, the City determined that Pinkston had run out of lay-up, furlough, and vacation time and, thus, was absent without authorization from his job starting on December 22, 2011. Of course, Pinkston disputes this. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 64; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 62–64; Pl.'s LR 56.1(b)(3)(C) Stmt. at 10–14.

In terms of how the City arrived at December 22, 2011, Section 7.3 of the CBA provides: "Any employee absent from work on account of a non-duty injury or illness for any period of time not exceeding twelve (12) months in any twenty-four (24) consecutive month period, shall receive full pay and benefits for the period of absence . . . ." *See id.* ¶ 60.[4] According to Edgar Ignacio, who was the Commander of Support Services in charge of processing all CFD terminations and calculating lay-up time for CFD employees, Def.'s LR 56.1(a)(3) Stmt. ¶ 6, the relevant twenty-four month period for Pinkston began on June 19, 2009. *Id.* ¶ 61.[5] Ignacio further attests that Pinkston had used 280 days during the period from June 19, 2009, and July 19, 2011. *See id.* ¶ 62. Using this number, Ignacio determined that Pinkston had exhausted his paid medical lay-up time on September 29, 2011. *Id.* ¶ 64. Ignacio then used Pinkston's furlough and vacation days to extend Pinkston's authorized leave time to December 22, 2011, *id*, on which date Pinkston was taken off of the CFD payroll. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 64. According to Pinkston, the City did this just one month before he could vest in seventy-five percent of his pension and nine days before he could obtain his 2012 vacation time. Pl.'s LR

---

[4]    As noted, supra at 2, it is disputed whether Pinkston, as an exempt-rank employee, is subject to the provisions of the CBA.

[5]    This would mean that the twenty-four consecutive month period for Pinkston ended on June 18, 2011, the day before Pinkston's June 19, 2011 lay-up, and presumably a new 24-month period began as of June 19, 2011, because "[t]he 12 of medical lay-up time starts over every 24 months." *See* Def.'s Ex. F, Ignacio Aff. ¶ 22.

56.1(b)(3)(B) Stmt. ¶¶ 36, 62–64; Pl.'s LR 56.1(b)(3)(C) Stmt. at 10–14; Pl.'s Dep. II, at 26:22–27:5, 52:10–12.

Although Pinkston no longer received a salary after December 22, 2011, he still received smaller paychecks for duty availability pay and uniform allowance pay in January, February, and April 2012. *Id.* ¶ 64; Pl.'s Dep. II Ex. 7, Employee Statement of Earning, PIN002207–PIN002209.

### D. Pinkston Files Two Charges of Discrimination Against the CFD

Pinkston filed a charge against the CFD with the Illinois Department of Human Rights (IDHR) on January 12, 2012, claiming that the CFD discriminated against him when it denied him the opportunity to return to work. Def.'s LR 56.1(a)(3) Stmt. ¶ 68. Specifically, Pinkston stated that Commander Sylvia Tienda discriminated against him based on race and perceived disability on December 19, 2011. *See* Pl.'s Dep. II, Ex. 10, 1/12/12 IDHR Charge, at 2.

Pinkston filed a second charge against the CFD with the IDHR on February 16, 2012. He claimed that the CFD's Fire Commissioner Robert Hoff discriminated against him based on race by denying the Age 55 Option on October 31, 2011. Def.'s LR 56.1(a)(3) Stmt. ¶ 68 (citing Pl.'s Dep. II, Ex. 11, 2/16/12 IDHR Charge).

### E. Pinkston Is Terminated

The City states that it sent Pinkston a letter dated March 20, 2012, by regular and certified mail, explaining that Pinkston had exhausted his lay-up time on December 22, 2011. *Id.* ¶ 65 (citing Pl.'s Dep. II, Ex. 8, 3/20/12 Letter (3/20/12 Letter). According to the City, the letter explained that, because Pinkston neither returned to work nor resigned, Pinkston was in "active" status without pay. *Id.* To "correct this anomaly," the City requested that Pinkston "return to work, resign or go on a leave of absence . . . . by April 1, 2012" and warned that

"[n]oncompliance would result in designating your status as 'absent without authorized leave'[.]" *Id.*

In response, Pinkston counters that he could not have received the letter or complied with the April 1, 2012, deadline and provides an American Airlines flight itinerary showing that he was out of town from March 23, 2012 to April 2, 2012. *Id.*; *see* Pl.'s Ex. 22, American Airlines Itinerary. What is more, Pinkston suggests CFD knew that he would be out of town on those dates. Pinkston avers that he never received this letter and contends that the City's lack of a signed receipt, despite its assertion that it sent the letter by certified mail, supports his contention that it was never sent. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 65.

Adrianne Bryant, CFD's Assistant Commissioner of Personnel, sent a letter dated April 12, 2012, notifying Pinkston that he was discharged from the CFD as of that date. Def.'s LR 56.1(a)(3) Stmt. ¶ 67. Bryant explained that Pinkston was discharged pursuant to Section 9.1C of the collective bargaining agreement. *Id.* Section 9.1C provides that an employee shall be terminated if absent without leave for three consecutive work days. *Id.* For his part, Pinkston asserts that he was notified for the first time in the April 12, 2012, letter that the City considered him absent without leave. Pl.'s Dep. II, at 89:3–18. Pinkston states that he has never heard of any DDC who was discharged for being absent without leave. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 67.

### F. Pinkston Files a Third Charge Against the CFD

After he was discharged, Pinkston filed a third charge against the CFD on May 8, 2012. Def.'s LR 56.1(a)(3) Stmt. ¶ 68. Pinkston claimed that the CFD terminated him based on race and perceived disability and retaliated against him for filing the previous two IDHR charges. Def.'s LR 56.1(a)(3) Stmt. ¶ 68 (citing Pl.'s Dep. II, Ex. 12, 5/8/12 IDHR Charge). Although the City asserts that Assistant Commissioner Bryant was unaware of the prior IDHR charges, she did

not make the decision to terminate Pinkston.  The City does not provide any evidence that then-Acting Fire Commissioner Jose Santiago, the actual decision maker, also was unaware of the IDHR charges.  *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 69–71; Pl.'s Ex. 10, Def.'s Supplemental Answers to 1st Set of Interrogatories ¶ 1.  By contrast, Pinkston says he had discussed his discrimination complaints with Santiago.  Pl.'s Dep. II, at 61:19–23, 80:8–81:2.

## Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015).  To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).  The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014).  The Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).  The Court must not make credibility determinations or weigh conflicting evidence. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010).

## Discussion

Pinkston asserts claims under § 1983 for violation of his constitutional right to equal protection of the laws, under the ADA for perceived disability discrimination, and under Title

VII for race discrimination.  He also alleges retaliation claims under both Title VII and the ADA.

The Court addresses each claim in turn.

## I. Section 1983[6]

Section 1983 provides a private right of action against persons acting under color of state

law who violate an individual's constitutional rights.  42 U.S.C. § 1983.  Under § 1983, a

municipality cannot be liable solely on the basis of the constitutional torts of its agents.  *Monell

v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 n.58 (1978).  A municipality can only be liable under

§ 1983 for constitutional violations caused by "(1) an express municipal policy; (2) a

widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with

'final policymaking authority.'" *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th

Cir. 2009).

Pinkston has not pointed to an express policy of discrimination or retaliation.  And

because Pinkston relies on the City's actions only with respect to his claims, he has not

established a custom or practice of discrimination or retaliation.  *See Daniel v. Cook Cty.*, 833

F.3d 728, 734 (7th Cir. 2016) (explaining that a *Monell* plaintiff "must show more than the

deficiencies specific to his own experience"); *see also Palmer v. Marion Cty.*, 327 F.3d 588, 596

(7th Cir. 2003) (two alleged incidents in a year does not constitute a widespread practice or

custom); *Cornfield v. Consol. High Sch. Dist.*, 991 F.2d 1316, 1326 (7th Cir. 1993) (same).

Beyond mere conjecture, Pinkston simply has not provided sufficient evidence of a pattern of

separate incidents in which the City discriminated or retaliated against other employees to

establish a widespread practice.

---

[6] The City analyzes some of Pinkston's claims under 42 U.S.C. § 1981.  However, "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989).

Moreover, the fire commissioners, who denied Pinkston the Age 55 Option and terminated him,[7] are not agents with final policymaking authority. "A person's status as a final policymaker under § 1983 is a question of state or local law." *Kujawski v. Bd. of Comm'rs*, 183 F.3d 734, 737 (7th Cir. 1999). "Courts identify those officials with final policymaking authority by '[r]eviewing the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law.'" *Killinger v. Johnson*, 389 F.3d 765, 771–72 (quoting *Jett*, 491 U.S. at 737) (internal quotations omitted). "[T]here must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." *Kujawski*, 183 F.3d at 739.

At first blush, the City's Municipal Code 2-36-200 grants a fire commissioner broad power: "The fire commissioner . . . shall manage and control all matters and things pertaining to the fire department and all persons employed therein." However, a fire commissioner's policymaking authority for managing and controlling CFD employees is curbed by the policymaking authority of the City's commissioner of human resources. *See* Municipal Code 2-74-050 ("The commissioner of human resources shall issue human resources rules, which may also be referred to as personnel rules."). In addition, a fire commissioner's ability to set policy for hiring and firing CFD personnel is also significantly limited in myriad ways by the governing collective bargaining agreement between the City and the local firefighters union. *See generally* Pl.'s Dep II, Ex. 4, CBA, July 1, 2007 through June 30, 2012 (setting policy regarding, among other things, hours of work, wages, leaves of absence, seniority, grievances, promotions, and layoffs). Having reviewed the municipal codes and the relevant legal materials, the Court

---

[7] Then-Fire Commissioner Robert Hoff decided that Pinkston did not qualify for the Age 55 Option. Def.'s LR 56.1(a)(3) Stmt. ¶ 76. Then-Acting Fire Commissioner Jose Santiago decided to terminate Pinkston. *Id.* ¶ 67; *see* Def.'s Ex. E, Bryant Aff. ¶ 3; Pl.'s Ex. 10, Def.'s Supplemental Answers to 1st Set of Interrogatories ¶ 1.

concludes that the City has not delegated to a fire commissioner the full authority to set policy for hiring, firing, and providing benefits to CFD employees. It follows that the City cannot be subject to liability for any single employment decision made by a Fire Commissioner.

Pinkston, therefore, has not created a triable issue of fact as to the existence of an express policy, a custom or practice having the force of law, or a decision by someone with final policymaking authority. Accordingly, the Court grants the City's motion for summary judgment with regard to Pinkston's § 1983 claim.

## II.    ADA Discrimination

In addition, Pinkston claims that he was unlawfully terminated because the City regarded him as having a disability. The ADA Amendments Act of 2008 ("ADAAA"), Pub. L. No. 110–325, 122 Stat. 3553 (effective January 1, 2009), signaled Congress's intent to reinstate "a broad scope of protection under the ADA." 29 C.F.R. § 1630.1. Under the ADA and its amendments, the term "disability" includes "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C). "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). Even under the amendments, however, "[p]aragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." *Id.* § 12102(3)(B).

The City first argues that Pinkston does not qualify as "being regarded as having an impairment" because his health issues did not substantially limit a major life activity. *See* Def.'s Mem. Supp. Summ. J. at 13. Under the amendments to the ADA, however, that is no longer a

defense. *See* 42 U.S.C. § 12102(3)(A) (stating that an individual can be regarded as having an impairment "whether or not the impairment limits or is perceived to limit a major life activity"). For this reason, the City's first argument is meritless.

Alternatively, the City also contends that Pinkston's health issues were transitory and minor. "It may be a defense to a charge of discrimination by an individual claiming coverage under the 'regarded as' prong of the definition of disability that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) 'transitory and minor.'" 29 C.F.R. § 1630.15(f) (2011). "Whether the impairment at issue is or would be 'transitory and minor' is to be determined objectively. . . . [and a] covered entity may not defeat 'regarded as' coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor . . . ." *Id.*

Based on the evidence in the record, viewed in the light most favorable to Pinkston, the Court concludes that his health conditions were transitory and minor. It is uncontroverted that Pinkston's lay-up began on June 19, 2011, and that, by early December 2011, four doctors had released Pinkston to full duty without restrictions. *See* Def.'s LR 56.1(a)(3) Stmt. ¶¶ 39 (Dr. Haak), 40 (Dr. Ali), 50 (Dr. Turner), 54 (Dr. Pitt); Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 54 (Dr. Turner); *see also* Def.'s Ex. K, Medical Records, at PIN000428 (Dr. Pitts), PIN001373–PIN001375 (Dr. Haak). In addition, Pinkston states that his shoulder pain ended in August 2011, Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 45, his knee pain ended in September 2011, *id.* ¶ 46, and his back pain ended on November 13, 2011, *id.* ¶ 45. Viewing all of the evidence, Pinkston's health conditions qualify as "transitory and minor" as defined by the amendments to the ADA, and no rational jury could hold otherwise. Accordingly, the Court grants the City's summary judgment motion as to Pinkston's ADA discrimination claim.

## II.     Title VII Race Discrimination

Next, Pinkston argues that the City discriminated against him based on race when it denied him the Age 55 Option and later terminated him.  In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), the Seventh Circuit refined the approach that district courts should take in evaluating Title VII claims.  Renouncing "the rat's nest of surplus tests" to evaluate Title VII claims (including direct versus indirect methods of proof), *id.* at 765–66, the court refocused the inquiry on "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  *Id.* at 765.  Under this inquiry, "[e]vidence must be considered as a whole," regardless of whether it is "direct" or "indirect" in nature (and without reference to those terms).  *Id.*  The *Ortiz* court noted that the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), remains a valid—but nonexclusive—method of proving a Title VII claim.[8]  *Ortiz*, 834 F.3d at 766.

In evaluating whether Pinkston's Title VII race discrimination claim survives summary judgment, the Court will consider the evidence in its entirety, viewing all disputed facts in his favor.  As part of its analysis, the Court also will consider whether Pinkston has made out a *prima facie* case under the traditional *McDonnell Douglas* framework.  Ultimately, however, the Court will focus on the more general inquiry of whether a reasonable jury could find that the

---

[8]     Under *McDonnell Douglas*, Pinkston must first show that "(1) he is a member of a protected class; (2) he performed his job to his employer's expectations; (3) he suffered an adverse employment action; and (4) one or more similarly situated individuals outside his protected class received better treatment."  *See Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 500 (7th Cir. 2017) (internal quotation marks omitted).  If Pinkston makes this showing, "the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action."  *Id.* Once the employer provides its reason, "the burden shifts back to the plaintiff to produce evidence establishing a genuine dispute of fact about whether the employer's reason was a pretext for discrimination."  *Id.*

City terminated him because of his race.  *See Pearson v. Ill. Bell Tel. Co.*, No. 15 C 653, 2016 WL 7374235, at *6 (N.D. Ill. Dec. 20, 2016) (adopting a similar approach in the wake of *Ortiz*).

The City mentions in its opening memorandum that Pinkston cannot establish a *prima facie* case, but the only element that the City briefly addresses is the requirement of an adverse employment action.  Adverse employment actions "generally fall into three categories:  (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge."  *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir. 2011).  "To be actionable, an employment action 'must be a significant change in employment status . . . or a decision causing a significant change in benefits.'"  *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (quoting *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007)).

## A.  The Age 55 Option

First, the City contends that a failure to notify Pinkston of the Age 55 Option retirement benefit was not an adverse employment action.  *See* Def.'s Mem. Supp. Summ. J. at 7.  This argument entirely misconstrues Pinkston's claim.  The gravamen of Pinkston's claim is the *denial* of the Age 55 Option retirement benefit, not merely the failure to *notify* him adequately of the retirement benefit.  There is little doubt that the denial of the retirement benefit constitutes an adverse employment action.  *See Sherman v. Dallas Cty. Cmty. Coll. Dist.*, No. CIV. A. 308-CV-2112-N, 2010 WL 2293165, at *5 (N.D. Tex. May 11, 2010) ("Denial of retirement benefits to an employee is considered an adverse employment action.").  Moreover, it would be reasonable to infer that an exempt-rank DDC, who has a relatively high seniority status, would have a good

chance of qualifying for the early retirement program. *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 14 ("successful applicants will be determined on the basis of seniority"). Accordingly, the Court concludes that the denial of the Age 55 Option qualifies as an adverse employment action.

In addition to establishing an adverse employment action, Pinkston has satisfied the remaining elements of a *prima facie* case of race discrimination. Pinkston has shown, and the City has not contradicted, that he had performed his job up to the City's expectations. Furthermore, the record contains facts from which a reasonable jury could infer that the City treated similarly situated white employees more favorably, because the only DDCs to successfully obtain the Age 55 Option retirement benefit were white. *See* Def.'s Ex. D, Vasquez Aff. Ex 6, at PIN001593; *id.* Ex. 7, 11/1/11 Reassignments, at PIN001678; *see also* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 18. Although the City is correct in pointing out that two black District Chiefs applied for and obtained the Age 55 Option, Pinkston has presented evidence that District Chiefs are not adequate comparators, because, among other things, they have firsthand access to information, such as the announcement that exempt-rank employees were eligible for the Age 55 Option, to which the DDCs are not privy. Def.'s LR 56.1(a)(3) Stmt. ¶ 1; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22. Thus, Pinkston has established a *prima facie* case of race discrimination.

The City's proffered nondiscriminatory reason for not allowing Pinkston to participate in the Age 55 Option is that he failed to apply. Def.'s Mem. Supp. Summ. J. at 9. A reasonable jury can conclude, however, that it was the City's own actions that precluded Pinkston from doing so. Indeed, if we credit Pinkston's testimony (which we must at this point), the first time that the City informed Pinkston of his eligibility for the Age 55 Option and the application requirements was a mere two hours before the application was due. Def.'s LR 56.1(a)(3) Stmt. ¶ 22; *see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 22; Def.'s Ex. D, Vasquez Dep. Ex. 4, Notice of Benefits,

PIN001405.  Although "we do not sit as a superpersonnel department that will second guess an employer's business decision . . . . we need not abandon good reason and common sense in assessing an employer's actions."  *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001).  A reasonable jury could find that by giving Pinkston—who the CFD knew was off-duty—only two hours to obtain the necessary paperwork from the CFD headquarters, to complete the paperwork, to have it notarized by a notary public, and to return the completed paperwork, the CFD's actual intent was to preclude Pinkston from qualifying at all.  What is more, the City appears to insinuate that it has the authority to selectively inform only some of its exempt-rank employees about the Age 55 Option, while excluding others.  *See* Def.'s Mem. Supp. Summ. J. at 7.  Based upon this record, which must be weighed in Pinkston's favor at the summary judgment stage, the Court holds that a reasonable jury could find that the City's reason for not allowing Pinkston to participate in the Age 55 Option was pretext.  *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 646 (7th Cir. 2013) ("Where an employer's reason for a termination . . . is completely unreasonable, that is evidence that an employer might be lying about its true motivation.").  Viewing the evidence as a whole in Pinkston's favor, as *Ortiz* requires, the Court concludes that this claim must be tried by a jury.

**B. Termination**

Next, the City argues that its failure to accurately calculate Pinkston's accrued leave time prior to his termination cannot qualify as an adverse employment action.  Again, this misconstrues Pinkston's claim.  Pinkston's claim is not directed at the manner in which the City calculated his accrual time, but his termination as a result of these calculations, and a termination certainly qualifies as an adverse employment action.  *See Barton*, 662 F.3d at 453–54.

That said, Pinkston has not offered any facts to support his theory that his termination was due to a race-based animus. Pinkston merely asserts, based upon his own belief, that white employees were not required to complete an FCE after a lay-up for orthopedic issues. Pl.'s LR 56.1(b)(3)(C) Stmt. at 11–12; Pl.'s Ex. 21, Members with Orthopedic Issues Who Didn't Have to Take the FCE, at 1; Pl.'s Dep. II, at 57, 107. But he provides no foundational basis for these assertions. The Court can only surmise that he learned this from other employees, but if that is the case, his knowledge would be based upon inadmissible hearsay. *See MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011) ("A party may not rely on inadmissible hearsay to avoid summary judgment.").[9]

Nor has Pinkston provided any evidence that there were any white DDCs, who also were absent without leave but not terminated by the City. Pinkston testified, "[T]here never has been one [DDC] in the history of Chicago Fire Department that has been discharged. . . . [o]n AWOL." Pl.'s Dep. II, at 30:2–4. When asked about the factual basis for his assertion, Pinkston responded, "The factual basis, check the history. That's the basis. . . . Who did I ask? . . . People who have been in the fire department." *Id.* at 30:8–23. Again, without more, his beliefs are based upon inadmissible hearsay. Viewing the record as a whole in Pinkston's favor, the Court finds that Pinkston has not created a triable issue of fact as to his race discrimination claim based upon his termination. Accordingly, the Court grants the City's motion as to this claim.

### III. Title VII and ADA Retaliation

Lastly, Pinkston claims that the City retaliated against him in violation of both Title VII, 42 U.S.C. § 2000e-3(a), and the ADA, 42 U.S.C. § 12203(a). Because Pinkston has not opted

---

[9] Pinkston also testified that no exempt-rank employee had ever mentioned to him that he or she had to undergo an FCE before returning from a lay-up. Pl.'s Dep. II, at 108. But, the fact that no exempt-rank employee had ever mentioned this to Pinkston does not create a reasonable inference that the CFD never imposed this requirement on an exempt-rank employee.

for the burden-shifting framework, the Court will examine whether the evidence as a whole would allow a reasonable jury to conclude that the City terminated Pinkston because he engaged in protected activity. *See Ortiz*, 834 F.3d at 765.

"The three elements of a retaliation claim are the same under Title VII and the ADA." *Johnson v. City of Chi. Bd. of Educ.*, 142 F. Supp. 3d 675, 693 (N.D. Ill. 2015); *see Bob–Maunuel v. Chipotle Mexican Grill, Inc.*, 10 F. Supp. 3d 854 n.7 (N.D. Ill.2014); *Anderson v. The Foster Grp.*, 521 F. Supp. 2d 758, 788 (N.D. Ill. 2007). A plaintiff must prove: (1) that he "engaged in statutorily protected activity"; (2) that he "suffered an adverse employment action"; and (3) that "there was a causal connection between the two." *Greengrass v. Int'l Monetary Sys. Ltd.*, 776 F.3d 481, 485 (7th Cir. 2015) (Title VII); *see Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011) (ADA).

As an initial matter, Pinkston has shown that he engaged in protected activity. On the heels of Fire Commissioner Hoff's denial of the Age 55 Option, Pinkston complained to the chain of command in early November 2011 that the denial was based on his race. *See* Pl.'s Dep. II, at 63:8–14; 80:8–13. In addition, on January 12, 2012, Pinkston filed a IDHR charge, claiming that Commander Sylvia Tienda discriminated against him based on race and perceived disability on December 19, 2011, when she prevented him from returning to work. Def.'s LR 56.1(a)(3) Stmt. ¶ 68; Pl.'s Dep. II, Ex. 10, 1/12/12 IDHR Charge, at 2. Then, on February 16, 2012, Pinkston filed another IDHR charge, alleging that the CFD's Fire Commissioner Robert Hoff discriminated against him based on race when he denied Pinkston the opportunity to participate in the Age 55 Option on October 31, 2011. Def.'s LR 56.1(a)(3) Stmt. ¶ 68 (citing Def.'s Ex. B, Pl.'s Dep. II, Pl.'s Dep. Ex. 11, 2/16/12 IDHR Charge).

Next, Pinkston suffered adverse employment actions. According to Pinkston, Commander Tienda precluded him from returning to work in December 2011, by refusing to allow him to obtain the necessary FCE. Def.'s Ex. B, Pl.'s Dep. II, at 13 (cited in Def.'s LR 56.1(a)(3) Stmt. ¶ 56). And Pinkston was eventually terminated based on his failure to return to work on April 12, 2012. Def.'s LR 56.1(a)(3) Stmt. ¶ 67.

The final requirement—causation—requires more explanation. "To demonstrate a 'causal link' between the protected activity and the adverse employment action, a plaintiff must show the defendant 'would not have taken the adverse . . . action but for [his] protected activity.'" *Greengrass*, 776 F.3d at 486 (quoting *King v. Preferred Techn. Grp.*, 166 F.3d 887, 892 (7th Cir. 1999)). But-for causation may be established through circumstantial evidence, including "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Id.* at 486. If a "plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that [retaliation] lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Baines v. Walgreen Co.*, 863 F.3d 656, 661–62 (7th Cir. 2017) (internal quotations marks omitted).

Viewing the record as a whole, Pinkston has successfully pointed to evidence from which a reasonable jury could conclude that his termination was retaliatory. In mid-November, while he was on lay-up, Pinkston complained that he had been denied the Age 55 Option based on his race to his boss, Jose Santiago, as well as his boss's boss, Fire Commissioner Hoff. Pl.'s Dep. II, at 53:11–22. A few weeks later, when Pinkston tried to return from lay-up, the CFD provided shifting reasons for delaying his return. Pinkston was required to see specialist after specialist, each of whom released him to full duty without restrictions. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 40,

54, 65; Def.'s LR 56.1(a)(3) Stmt. ¶¶ 40, 46, 50; Pl.'s Dep. II, at 26:11–13; Def.'s Ex. K, Medical Records, at PIN000415, PIN001373–PIN001375. Then, after Pinkston submitted work releases from four separate physicians, the CFD informed him that he was required to undergo an FCE in order to return to work. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 56. But when Pinkston asked the CFD's Medical Division to schedule an FCE, Commander Tienda refused and warned Pinkston not to return to the Medical Division. Def.'s Ex. B, Pl.'s Dep. II, at 13 (cited in Def.'s LR 56.1(a)(3) Stmt. ¶ 56). According to the CFD, Pinkston was taken off of payroll and later terminated because he had failed to return to work after his lay-up. But a reasonable jury can conclude from these facts that it was the CFD that prevented him from returning to work, when he wanted to do so.

It is also significant that the very person to whom Pinkston had complained about discrimination, Jose Santiago, made the decision to discharge him. *See* Pl.'s Dep. II, at 53:11–22.; Pl.'s Ex. 10, Def.'s Supplemental Answers to 1st Set of Interrogatories ¶ 1. Perhaps more significant, however, is the fact that the rationale that the CFD used to terminate Pinkston appears to conflict with the requirements of Section 7.3 of the CBA as well as the CFD's own procedures.

According to Ignacio, a CFD employee may be absent for a total of twelve months due to an non-duty injury in a twenty-four consecutive month period; and (2) Pinkston's twenty-four consecutive month period began on June 19, 2009. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 60–61. Presumably, this would mean that a new twenty-four month period started on June 19, 2011, when Pinkston's lay-up began.[10] Inexplicably, however, Ignacio added the 280 days that Pinkston was off work during the twenty-four month period between June 19, 2009, and June 19,

---

[10] The City provides no evidence that the twenty-four month period is a rolling one or that the twenty-four month period should be calculated in any other way.

2011, to the days that he was off work *after* June 19, 2011, in order to conclude that Pinkston ran out of authorized leave time (including any furlough days and accrued vacation time) on December 22, 2011. *See id.* ¶ 62.

These facts, when considered as a whole and viewed in the light most favorable to Pinkston, could support a rational jury's finding that the City terminated Pinkston in retaliation for his complaining about discrimination. The Court, therefore, denies the City's summary judgment motion as to Pinkston's Title VII and ADA retaliation claims.

## Conclusion

For the reasons set forth herein, Defendant's motion for summary judgment is granted in part and denied in part [84]. The motion is granted as to Pinkston's § 1983 claim, ADA discrimination claim, and Title VII race discrimination claim based on his termination. The motion is denied as to Pinkston's Title VII and ADA retaliation claims, as well as his Title VII race discrimination claim based on the denial of the Age 55 Option. At the status hearing, the parties shall be prepared to set a trial date.

**SO ORDERED**                    **ENTER:  9/29/17**

_____
**JOHN Z. LEE**
**United States District Judge**